**In re Robert D. LONIAN, Debtor.**

**Pearl Marie LONIAN, Plaintiff,**

**v.**

**Robert D. LONIAN, Defendant.**

**Bankruptcy No. 96-16093-TS.**
**Adversary No. 96-1354-TS.**

United States Bankruptcy Court,
W.D. Oklahoma.

Sept. 28, 1998.

James Vogt, Reynolds, Ridings, Vogt & Morgan, Oklahoma City, OK, for Plaintiff.

Jackie L. Hill, Jr., Britton, Gray & Hill, Oklahoma City, OK, for Defendant.

## ORDER REGARDING DISCHARGEABILITY OF DEBT

JOHN TeSELLE, Chief Judge.

Plaintiff, Pearl Marie Lonian, initiated this adversary proceeding by the filing of her **Complaint to Determine Dischargeability of Debt** (hereinafter the "Complaint"). The Complaint seeks a determination that certain obligations owed Plaintiff by Defendant, Robert D. Lonian, are excepted from Defendant's discharge in bankruptcy pursuant to 11 U.S.C. § 523(a)(5) and (a)(15). The obligations at issue arise from a Decree of Divorce entered by the District Court of Oklahoma County, Oklahoma, and as set forth in

the Complaint were: 1) $1,000.00 per month for child support during the minority of the parties' child, Heather Lonian; 2) $180,-000.00 in support alimony; and 3) $505,000.00 in alimony in lieu of property division.

Subsequent to the filing of the Complaint the parties agreed that Plaintiff was entitled to judgment against Defendant as to the child support and alimony obligations, and on January 9, 1997, this Court entered an **Agreed Partial Judgment** excepting those obligations from Defendant's bankruptcy discharge. This left for trial Defendant's obligation to pay Plaintiff $505,000.00 as alimony in lieu of property division.[1]

After several continuances for various reasons, including to facilitate an ultimately unsuccessful settlement conference, this proceeding came on for trial. During the trial, the Court listened attentively to the testimony of the witnesses and observed their demeanor, received the evidence, and heard the arguments of counsel. Subsequently, the Court has reviewed the testimony, the evidence, and the applicable law, and now issues the following Findings of Fact, Conclusions of Law and Decision.

## Findings of Fact

### A. Background

1. Defendant attended undergraduate school at Harvard College and obtained his medical degree from Harvard University in 1973. Plaintiff and Defendant married during the first semester of Defendant's junior year of medical school. Prior to their marriage, Plaintiff had obtained her Bachelors degree and M.Ed. in counseling. Plaintiff worked while Defendant completed medical school as well as during the next five years while he was involved in various levels of training in various locations.[2] In 1978 the parties moved to Oklahoma where Defendant initially worked part-time at Oklahoma University medical school, part-time at the office of a private physician, and part-time at the emergency room at Tinker Air Force Base. He opened his private practice in 1990. He is board certified in Internal Medicine, which required three years of specialized training and successfully passing an examination, and is also board certified in Sports Medicine, for which he took and passed an examination based upon his prior experience and now must complete a fellowship. Plaintiff worked first at Oklahoma City Community College, then managed Defendant's office for three to four years, then took a job at Rose State College.

2. In February 1995, after approximately 24 years of marriage, Defendant sued Plaintiff for divorce. *Lonian v. Lonian*, Case No. FD–95–977 (D. Okla. Co. filed Feb. 28, 1995). At that time, the couple had five living daughters, three of whom had reached the age of majority, one who turned eighteen the month following the divorce trial, and one who was still a minor and in high school.

3. On April 1 and 2, 1996, the District Court of Oklahoma County conducted the trial in the divorce proceeding then announced its ruling on April 3, 1996. That ruling was memorialized in a written Decree of Divorce entered May 15, 1996 (hereinafter the "Decree"). The Decree granted the parties a divorce and awarded to Defendant "[h]is medical practice [worth $800,000.00], including the furniture, fixtures and equipment which have a stipulated value of $350,-000", a home located at 8217 Lakehurst Drive [hereinafter the "Lakehurst Home"], a home located at 2300 N.W. 114th Street [hereinafter the "114th Street Home"], three vehicles, a $10,000.00 pocket watch, credit card security in the amount of $10,000.00, personalty valued at $50,000.00, exotic pets,

1. At the time Plaintiff filed her Complaint and at the time the Court entered the Agreed Partial Judgment, the Decree was on appeal. The Oklahoma Court of Civil Appeals issued an opinion in the appeal prior to trial, so the obligations actually at issue during the trial differed from those set forth in the Complaint. *See* Findings of Fact at ¶ 4. Additionally, by the time of the trial, Heather Lonian had attained the age of majority and was graduating from high school the next week, thus it was conceded there was no longer any legal obligation to pay child support on her behalf.

2. Plaintiff testified she worked during every year of the parties' marriage except one, including the eight years in which she was pregnant eight times.

and guns.[3] Plaintiff was awarded child support in the amount of $1,000.00 per month, alimony in lieu of property division in the amount of $505,000.00,[4] support alimony in the amount of $180,000.00,[5] her two retirement accounts valued at $18,443.00 and $31,-665.00, one vehicle, personalty valued at $9,986.00, and a lien on Defendant's medical practice to secure her award of alimony in lieu of property division. The Decree finally ordered each party to pay his or her own attorney fees and costs.

4. Both parties appealed the Decree, and on August 1, 1997, the Oklahoma Court of Civil Appeals issued its Memorandum Opinion. The Court of Appeals reduced the amount of Plaintiff's alimony in lieu of property division from $505,000.00 to $280,000.00, determined that the award to Plaintiff of support alimony was inappropriate, upheld the granting to Plaintiff of a lien on Defendant's medical practice, reversed the trial court's ruling on the tax consequences of the property division alimony, reversed the trial court's ruling on attorney fees, and remanded the case for reconsideration of the attorney fee issue with instructions to conduct a hearing and award a reasonable attorney fee to Plaintiff.[6]

**B. Plaintiff's Situation**

5. At the time of the divorce trial and for the previous 7–8 years, Plaintiff was employed at Rose State College. During the four years immediately preceding the divorce, she was a Program Administrator with a salary of $38,500.00. Immediately following the divorce trial, Plaintiff relocated to Boston. In reliance on the payments Defendant was ordered to make to her under the Decree, Plaintiff had planned to work part-time and return to school for her doctorate degree when she moved to Boston, so that she could better support herself. During her first three months in Boston, Plaintiff was ill and was hospitalized twice, thus was unable to work. By the end of that time, Defendant had made only one $3,000.00 payment to her under the Decree[7] and had filed his voluntary bankruptcy petition in August 1996. Thereafter, from October through December Plaintiff worked as a temporary employee doing mostly secretarial work, then worked for the Aids Action Committee from January through March of 1997. In April 1997, Plaintiff obtained employment as Vice–President of Operations for a non-profit organization called "The Partnership". Plaintiff's salary is $52,000.00 per year and her employer provides only medical benefits.

6. Also in reliance upon the amounts Defendant was to pay her pursuant to the Decree, Plaintiff began negotiating to purchase a home when she moved to Boston. The lending institution placed the loan on hold in order to ascertain whether Defendant would make the monthly payments under the Decree, and ultimately declined to approve the loan when Defendant failed to make the court-ordered payments to Plaintiff then filed for bankruptcy. The lending institution additionally considered the fact that Plaintiff "owned" two properties in Oklahoma, one foreclosed and the other in default, even though pursuant to the Decree she had deeded her interest in both houses to Defendant. The Lakehurst Home has been foreclosed and the deficiency waived as to Plaintiff. As of the date of the adversary trial, no legal action had been initiated as to the 114th Street Home.

3. The Decree further ordered Defendant to pay the obligations on the two homes and the 1995 income tax liability, and to hold Plaintiff harmless from all liability on those obligations.

4. Defendant was ordered to pay this amount at the rate of $5,000.00 per month for 101 months beginning April 10, 1996.

5. Defendant was ordered to pay this amount at the rate of $3,000.00 per month for sixty months beginning April 10, 1996.

6. At the inception of the trial, counsel for Plaintiff informed the Court that during the previous week the state court had issued an order awarding attorney fees to Plaintiff in the amount of $12,000.00, and raised the question of the dischargeability of this award. Counsel for Plaintiff and Defendant agreed to submit this issue to the Court on briefs, and further agreed that there would be no testimony during the trial on this issue.

7. Defendant made the $3,000.00 payment to Plaintiff in April 1996. Plaintiff subsequently recovered approximately $10,000.00 from Defendant through garnishment proceedings prior to his bankruptcy filing.

7. Plaintiff is now 51 years old. She lives in a 1,700 square foot house owned by her sister and brother-in-law. They are leasing it to her for $1,500.00 per month even though they could lease it on the open market for $2,000.00 per month. Since January or February of 1998 Plaintiff has only been paying them $800 per month pending the outcome of Defendant's bankruptcy. She has explored buying this house but it would cost her between $200,000.00 and $250,000.00. Her monthly expenses are approximately $6,200.00, as follows.

| | |
|---|---|
| Rent | $1,500 |
| Car Payment | $ 399 |
| Car Insurance | $ 176 |
| Life Insurance | $ 195 |
| 401K Plan [8] | $ 200 |
| Electric | $ 125 |
| Oil/Furnace | $ 195 |
| Telephone [9] | $ 250 |
| Clothing | $ 250–300 |
| Food | $ 450 |
| Dry Cleaning | $ 132 |
| Gasoline | $ 70 |
| Local Travel/Parking [10] | $ 150 |
| Furniture/Household Appliance Replacement [11] | $ 500 |
| Summer Lawn Maintenance/ Winter Snow Removal [12] | $ 200 |
| Rubbish Removal | $ 120 |
| Entertainment | $ 250 |
| Travel [13] | $ 290–334 |
| Medical Expense | $ 40–50 |
| Renter's insurance | $ 37.50 |
| Credit card payments | $ 150.00 |
| Church contributions | $ 50–100 |
| Miscellaneous | $ 200–250 |

Plaintiff can no longer afford cable television, and since the divorce has assisted her daughters with necessities whenever possible. She paid $1200.00 for her eldest daughter to take the bar review course and sent this daughter $200.00 per month for incidentals not covered by financial aid. She also paid $1,600.00 for her second daughter to take a calculus class, and has provided funds for other daughters for books and to travel to Boston for visits.

8. As of the date of the adversary trial, Plaintiff's current assets were:

| | |
|---|---|
| Her interest in Defendant's medical practice | $ Value unknown |
| Checking account | $ 2,200.00 |
| Personal Property (awarded in Decree) | $ 9,000.00 |
| 1994 Chevrolet Cavalier | $ 6,000.00 |
| TIAA/CREF Retirement Annuity | $42,000.00 |
| Putnam Investment Annuity [14] | $ 800.00 |
| Jewelry [15] | $17,000.00 |

9. Plaintiff's liabilities at the time of the adversary trial were:

| | |
|---|---|
| American Savings Bank [16] | $ –0– |
| Local Federal Mortgage Company [17] | $71,000.00 |
| Lincoln National Bank [18] | $ 7,000.00 |

8. Plaintiff's employer does not provide any retirement benefits.

9. This expense is about the same as the parties' monthly phone bills were in Oklahoma, and is high because Plaintiff has five daughters in different locations and has elderly parents in New Orleans.

10. Plaintiff's commute to work is 28 miles each way. She typically rides the train and subway, for which a rail pass costs $94 per month. On days she must work late and therefore must drive her car, she spends $34 per day for parking.

11. Plaintiff is having to replace many household furnishings and appliances since the majority of those items were awarded to Defendant under the Decree.

12. Due to a cardiac condition, Plaintiff must have these services performed for her.

13. This amount includes trips for Plaintiff to check on her elderly parents in New Orleans as well as trips for her daughters to visit her.

14. This IRA originally totaled $17,133.79. Plaintiff has expended almost all of it to pay for necessary living expenses not covered by her salary.

15. Plaintiff attempted to sell this jewelry but could not do so because Defendant holds the appraisal.

16. This obligation arises from the financing of the Lakehurst Home. At the time of the adversary proceeding Plaintiff testified that the foreclosure had been completed and the mortgage holder had waived any deficiency as to her.

17. This obligation arises from the financing of the 114th Street Home. The Decree awarded this property to Defendant and directed him to hold Plaintiff harmless from any liability arising from this obligation. Plaintiff has quitclaimed her interest in this property to Defendant, but as of the time of the adversary proceeding, Defendant had not indemnified Plaintiff thereupon.

18. This amount represents a deficiency judgment entered against Plaintiff after the sale of a car repossessed when Plaintiff could no longer make payments during the pendency of the divorce proceedings.

| | |
|---|---|
| Memorial Bank–Auto Loan balance | $ 6,000.00 |
| Legal fees–divorce proceeding | $32,373.72 |
| Credit card balance | $ 2,400.00 |
| Medical expenses | $ 2,292.00 |
| Deferred rent | $ 7,000.00 |
| Personal loan | $ 3,000.00 |
| Internal Revenue Service [19] | $ 2,300.00 |

### C. Defendant's Situation

10. At the time of the divorce proceeding, Defendant owned his private medical practice. In 1994, Defendant's income from his medical practice was $330,000.00. In 1995, his income was $360,000.00. In 1996, his income was $181,000.00. At the time of adversary trial he had not filed his 1997 tax return, but based upon data contained in his December 1997 monthly operating report estimated his 1997 income to be approximately $128,500.00.

11. During the pendency of the divorce, Defendant was ordered to make temporary support payments of $8,000.00 per month to Plaintiff, and child support payments of $1,000.00 per month. He testified that for a year he either paid these amounts to Plaintiff or paid them directly, e.g. for the mortgage on the Lakehurst Home or for tuition for their children. During this time, he failed to pay his office rent, failed to pay the health insurance premiums for himself and his employees which resulted in the cancellation of the insurance, and failed to make payments on leased equipment in his office. In approximately April of 1996, he reinstated the health insurance to keep his employees, had to pay his landlord or face eviction, and had to make payments on his leased equipment or risk losing it. Thus, he did not make the payments to Plaintiff that were ordered in the Decree.

12. In August 1996, scarcely three months after entry of the Decree, Defendant filed his voluntary chapter 11 petition.

13. As of the time Defendant filed his bankruptcy petition, pursuant to the Decree he owned the Lakehurst Home and the 114th Street Home. Defendant ceased making payments on both homes at the time of or shortly after his bankruptcy filing. When the Lakehurst Home was foreclosed, Defendant thought he might want to live in the 114th Street Home so had his attorney ask the long-term tenants to vacate. The tenants made an offer to purchase the 114th Street Home which Defendant declined, so the tenants ultimately vacated. However, there was no evidence that Defendant ever actually moved back into this house. At the time of the adversary trial, the 114th Street Home was still vacant, and Defendant testified he had no intention to move back into this house. Additionally, although the mortgage on the 114th Street Home was in default, as of the time of the adversary trial Defendant had not received notice that the lender had initiated foreclosure proceedings.

14. During bankruptcy Defendant also entered into a one-year lease on a home in Quail Creek addition. Defendant paid $2,000 per month for twelve months to rent that home but, for reasons not made clear in the record, never lived there.

15. Also during the time his bankruptcy has been pending, Defendant has paid, *inter alia*, $728.97 per month for disability insurance, approximately $230 per month for a $2,000,000.00 life insurance policy of which his eldest daughter is the beneficiary, an average of $1,800.00 per month on credit cards, and expended significant sums to send two of his daughters abroad—one to France and the other to China.

16. At the time of the adversary trial, Defendant was 51 years old and resided in a fully furnished apartment for which he paid rent of $590 per month, plus electricity. Defendant testified that the furniture he received under the Decree was broken and/or worn out, yet admitted he was paying $900.00 per month to store that same furniture, along with some fine art.

17. Defendant testified that he had been a physician for 25 years and had practiced for twenty years, with eighteen of those years as a sole practitioner. In May 1997, approximately two weeks before the adversary trial, Defendant closed his medical practice, though he had patients scheduled into

19. This amount represents an early withdrawal penalty on the IRA Plaintiff has utilized to supplement her income.

August. He removed his medical records and personal items, and retained only his former office manager who is answering the phone, copying medical records, and assisting him in collecting the outstanding accounts receivable. Previously, as a part of her collection efforts, this employee had filed new physician's liens and renewed existing physician's liens every two weeks, and had filed 370 such liens in 1995 and 350 such liens in 1996.[20] However, upon the closure of the office she ceased filing all physician's liens.

18. Defendant stated he did not intend to reopen a private practice but had conducted a nationwide search for employment and had accepted a position in another state contingent upon being licensed in that state and admitted to practice there. Despite his impressive credentials, Defendant testified that the highest salary offer he had received was $120,000.00 per year.

19. Defendant represented that he would be living in an area with a climate similar to that in Boston where his expenses would be similar to the expenses Plaintiff was incurring, and adopted Plaintiff's schedule of expenses as his own. Although he was living in a furnished apartment at the time of the trial, he testified it would be important for him to live in a house in his new locale so that he could keep his daughter's Great Dane. He also stated he would need a four-wheel drive vehicle in his new locale so would have to continue the lease on his Chevrolet Tahoe.

20. Pursuant to the Monthly Operating Report filed by Defendant for the month of December 31, 1997, Defendant's total assets were worth $497,783.19 and his total liabilities were $206,295.57, thus resulting in a net worth of $291,487.62. These figures do not include Defendant's liability for 1996 federal and state taxes nor do they include Defendant's liability to Plaintiff under the Decree, even though those obligations were known to him at the time the report was prepared. A claims summary submitted during the adversary trial estimated the total claims allowed in Defendant's bankruptcy would be $1,207,-502.00, if he fails to prevail in this adversary proceeding.

21. The December Monthly Operating Report also reflects that Defendant's medical practice and the accounts receivable upon which Plaintiff claims a lien are worth only $401,000.00. The medical practice and these same receivables were valued at $800,000.00 by the divorce court, and were valued by Defendant at $750,000.00 at the time of the divorce trial (after his office had eliminated all "dead wood") and at the time he filed his bankruptcy petition.

22. Since 1995, Defendant has failed to pay federal and state personal income taxes. His tax liability for 1995 is $150,601.00, and his tax liability for 1996 is $71,715.00. At the time of the adversary proceeding he had not yet prepared his 1997 tax returns, but estimated his liability for 1997 would be $41,-000.00. During these years, when Defendant earned $360,000.00, $181,000.00, and $128,-500.00 respectively, Defendant did not pay any estimated taxes or have any of his salary withheld for tax purposes. These figures do not include penalties and interest or other tax liabilities incurred in relation to his business and real property. Including those items, his total tax liability is approximately $330,000.00.

### D. Family Situation

23. At the time of the adversary trial, the parties' oldest daughter was completing her last week at Harvard Law School, was registered to take the Bar Examination in July, and had secured employment as an associate in a Washington, D.C. law firm. The parties' second oldest daughter lives in Massachusetts, and is currently working. This daughter had completed two years at Harvard University. Defendant was to pay her tuition but failed to do so. When her tuition was not paid, Harvard would not allow her to re-enroll and would not forward her transcript to any other schools. The parties'

20. This employee testified that physician's liens must be filed on a yearly basis to maintain their validity. She did not specify what type of services gave rise to a physician's lien, but Okla. Stat. tit. 42, § 46 provides that "every physician who performs medical services for any person injured as a result of the negligence or act of another" shall have a lien on any settlement proceeds or insurance proceeds recovered as a result of such negligence.

third daughter has completed her second year at Rice University. The parties' fourth daughter has completed one year at Emory University. Defendant was to pay her tuition and fees, but failed to do so, so she was not allowed to re-enroll. The parties' youngest daughter was completing her last week at Heritage Hall High School, for which Defendant had paid the tuition. She had accepted an offer from Yale University, where she will need $18,000.00—$21,000.00 in contributions from her parents, but also had an opportunity to attend Oklahoma University, where she would have been a "Challenge Scholar" with a full scholarship and stipend.

**Conclusions of Law**

1. The applicable section of the Bankruptcy Code provides that:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
>
> (15) not of the kind described in paragraph (5) that is incurred by the debtor in the course of a divorce or separation or in connection with a separation agreement, divorce decree or other order of a court of record, a determination made in accordance with State or territorial law by a governmental unit unless—
>
> (A) the debtor does not have the ability to pay such debt from income or property of the debtor not reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor and, if the debtor is engaged in a business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business; or
>
> (B) discharging such debt would result in a benefit to the debtor that outweighs the detrimental consequences to a spouse, former spouse, or child of the debtor.

11 U.S.C. § 523(a)(15).

2. In a typical dischargeability proceeding, Plaintiff would bear the burden of proving her case by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991). However, when proceeding under § 523(a)(15), there is a "rebuttable presumption that any property settlement obligation arising from a divorce is nondischargeable unless the debtor can prove one of the two [elements] set forth in § 523(a)(15)(A) or (B)." *Slover v. Slover (In re Slover),* 191 B.R. 886, 891 (Bankr.E.D.Okla.1996) (citations omitted). The parties stipulated that Plaintiff's claim falls within the purview of § 523(a)(15), and Plaintiff introduced into evidence the Decree which reflects the obligation at issue was incurred in connection with a divorce. *Florio v. Florio (In re Florio),* 187 B.R. 654, 657 (Bankr.W.D.Mo.1995). Plaintiff has thus established the rebuttable presumption that the obligation is nondischargeable. The Defendant now bears the burden of going forward and showing either that he does not have the ability to pay the obligation or that the benefit to him of discharging the obligation will outweigh any detrimental consequences such discharge will have on Plaintiff. *Id.* at 657.

3. During the trial, Defendant presented testimony and evidence to support his assertion he does not have the ability to pay the obligation owed Plaintiff. His projections were as follows:

Projected Disposable Income

| | | Annual | Monthly |
|---|---|---|---|
| Projected Annual Income | | $120,000.00 | $10,000.00 |
| Current Withholdings—State/Federal | (33%) | $ 39,600.00 | $ 3,300.00 |
| Net Take Home | | $ 80,400.00 | $ 6,700.00 |
| Priority Tax Garnishments (maximum) | (25%) | $ 20,100.00 | $ 1,675.00 |
| Disposable Income | | $ 60,300.00 | $ 5,025.00 |
| Projected Household Budget | | $ 73,140.00 | $ 6,095.00 |

| | | |
|---|---|---|
| Excess Income not reasonably necessary for maintenance and support of Defendant | ($12,840.00) | ($1,070.00) |

The Court notes that Defendant has deducted 25% from his salary for priority tax garnishments. The evidence is clear that Defendant failed to pay taxes he knew he owed, even when he earned as much as $360,000.00. To allow Defendant to assert he has no ability to pay the obligations he owes Plaintiff, because he must first pay the back taxes he appears to have made no effort to pay previously, is to reward him for his folly. For this reason, the Court believes it would be improper to consider Defendant's tax obligations in arriving at its determination of dischargeability under § 523(a)(15) in this case.

The Court further notes that Defendant's testimony and evidence was based upon the salary of $120,000.00 per year he represented he would receive as an employee in a hospital in another state. However, where a debtor voluntarily leaves one job to take a lesser paying job and thereafter asserts lack of ability to pay an obligation the Court may consider the income the debtor is capable of making. *Florio,* 187 B.R. at 657. In the instant case, the Court notes that in 1994 and 1995 Defendant made $330,000.00 and $360,000.00 respectively. It was only in 1996, the year the parties' divorce was final and Defendant became obligated to pay alimony and support to Plaintiff, that Defendant's income took a nosedive. This was followed by a further decline in 1997 while the parties continued to litigate over these obligations, and finally by the closing of Defendant's office in 1998, shortly before the trial of this adversary proceeding. There was also evidence that Defendant, through his employee, has ceased the filing and renewal of physician's liens, thus is failing to preserve his rights as to accounts receivable in which Plaintiff claims a lien.[21] Having observed Defendant on the witness stand and having heard his testimony, the Court's impression is that Defendant's decrease in income and subsequent closing of his office were the result of actions taken in part to deliberately place him in a position to defeat Plaintiff's claim. Accordingly, while the Court will analyze Defendant's ability to pay the obligation he owes Plaintiff based upon income of $120,000.00 per year, the Court will consider that a minimum salary with a high probability that once Defendant is forced to face up to his financial obligations, his earnings will increase significantly in the future.

Reproduced below are Defendant's projections without deduction for tax garnishments:

Projected Disposable Income

| | | Annual | Monthly |
|---|---|---|---|
| Projected Annual Income | | $120,000.00 | $10,000.00 |
| Current Withholdings—State/Federal | (33%) | $ 39,600.00 | $ 3,300.00 |
| Disposable Income | | $ 80,400.00 | $ 6,700.00 |
| Projected Household Budget | | $ 73,140.00 | $ 6,095.00 |
| Excess Income not reasonably necessary for maintenance and support of Defendant | | $ 7,260.00 | $ 605.00 |

21. The validity of Plaintiff's lien is the subject of another order which will be entered concurrently herewith.

Under this analysis, Defendant would currently have approximately $605.00 per month in disposable income. This amount could increase immediately if Defendant were to curtail his lavish lifestyle. Based upon the foregoing, it is the Court's opinion Defendant has failed to establish that he does not now have the ability to pay the obligation owed Plaintiff. Defendant has in the immediate past chosen to live beyond his means while ignoring his duty to pay taxes and his obligation to Plaintiff. Such conduct should not be rewarded.

4. This conclusion does not end the inquiry though, as the obligation may still be dischargeable if the Court finds that such discharge is more beneficial to Defendant than it is detrimental to Plaintiff. In reviewing Plaintiff's situation, she is 51 years old, and her yearly salary is $52,000.00 with little prospect of any significant increase. She is living a frugal lifestyle, yet her current monthly expenses, exceed her monthly income. She has already exhausted one of her retirement accounts by using it to supplement her salary just so she can meet her monthly expenses. She has sacrificed in order to provide funds for *necessities* for her daughters. She was married to Defendant for approximately 24 years, helped him obtain the education and training that has enabled him to earn a six-figure income, raised five children, and now has very little to show for it. Indeed, if Defendant is discharged from his obligation to pay Plaintiff, she will constantly struggle just to subsist.

On the other hand, Defendant states his income will be $120,000.00 per year. As set forth above, it is the Court's belief Defendant is quite capable of earning significantly more than that. Defendant has continued to live a lavish lifestyle while in bankruptcy, spending money on rental homes he never occupied, spending $22,000.00 on credit card charges in 1997, spending $900.00 per month for questionable storage charges, and spending approximately $1,000.00 per month for insurance policies. Defendant jeopardized his daughters' educational opportunities by failing to pay their school tuition, yet sent two daughters on vacation trips abroad. During 1995, 1996, and 1997, when Defendant earned $330,000.00, $360,000.00 and $181,000.00 respectively, he paid no estimated income taxes, yet now says he cannot pay his obligation to Plaintiff because he owes over $300,000.00 to state and federal taxing authorities. The Court is mindful that Defendant is dealing with other obligations in his bankruptcy that are not included in his monthly expense summary, toward which any excess disposable income could be applied. However, in view of the totality of the circumstances, the Court is of the opinion that to allow Defendant to discharge his obligation to Plaintiff would be far more detrimental to Plaintiff than it would be beneficial to Defendant.

5. The Court will next consider the issue of the dischargeability of the attorney fees awarded to Plaintiff by the District Court of Oklahoma County. Plaintiff argues that this award effectively replaced support and should be so characterized since the Court of Appeals directed the trial Court to award Plaintiff a reasonable attorney fee after the appellate court eliminated her previous award of support alimony. In bankruptcy, an award of attorney's fees rises or falls with the discharge of the primary obligation. *Miskovsky v. Skinner,* 88 B.R. 360, 361 (W.D.Okla.1987) (citation omitted). In this case, there is no support obligation before the Court for adjudication and thus no primary obligation upon which the attorney fee award can be based. Accordingly, the award of attorney fees is dischargeable in Defendant's bankruptcy.

## Decision

There is no such thing as a successful divorce. This case epitomizes that maxim. In its over ten years on the bench, this Court has never, until this case, seen such far-reaching destruction and debilitation result from a divorce that has impacted not only the parties but also their five children.

In light of the foregoing Findings of Fact and Conclusions of Law, the $280,00.00 obligation owed Plaintiff by Defendant is excepted from his discharge in bankruptcy. The attorney's fee awarded to Plaintiff, in the amount of $12,000.00, is discharged.